```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
    RAYMOND LYNCH,                                          :
                                                            :   MEMORANDUM DECISION
                                Plaintiff,                  :   AND ORDER
                                                            :
            - against -                                     :   20-cv-2294 (BMC)
                                                            :
    COMMISSIONER OF SOCIAL                                  :
    SECURITY,                                               :
                                                            :
                                Defendant.                  :
                                                            :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

Plaintiff seeks review of the decision of the Commissioner of Social Security, following a hearing before an Administrative Law Judge, that he is not disabled for the purpose of receiving disability insurance benefits. The ALJ found that although plaintiff has severe impairments of cervical spine stenosis, carpal tunnel syndrome in both hands, right cervical radiculopathy, and obesity, he had the residual functional capacity to perform light work except with only "frequent" bilateral reaching around, handling, or fingering, and with only occasional climbing of ladders, ropes, or scaffolds. Since that residual functional capacity was consistent with plaintiff's past relevant work as a train operator (according to testimony from a vocational expert), the ALJ found that plaintiff was not disabled.

Focusing on his carpal tunnel syndrome, plaintiff argues that there was not substantial evidence to show that he could perform his past relevant work. In particular, plaintiff emphasizes that as a train operator, he is required to operate what is known as a "dead man's switch." That is a fail-safe device that requires the application of constant pressure for the railcar to move. The vocational expert testified that a train operator has to "frequent[ly]" apply pressure

to the dead man's switch.  Plaintiff contends that maintaining "frequent" pressure on the switch will cause him too much pain in his hands when performing this type of "light" work.[1]

Plaintiff's argument is not without some support in the record, both subjective and objective.  He testified that it would be painful to operate the train:

> Q: Would it cause you severe pain to [do your past work]?
>
> A: Yes, because you're constantly using your hands, you know.  There's a feature on the train called the dead man feature which you have to hold down continuously while you're operating the train or the train goes into emergency so that plus the other operation of, you know, maybe using the radio to communicate with control center, you know, it's just, you know, you're constantly opening doors, unlocking this, just and the instan[t] that the train goes into emergency you're required to get off the train, dismount the train and walk around.  It's a lot.

The medical testing confirms that plaintiff has an impairment.  An electroneurodiagnostic study report, which included an electromyogram ("EMG"), was interpreted as "reveal[ing] evidence of a severe bilateral median nerve neuropathy at the wrist" that was "consistent with the clinical diagnosis of Carpal Tunnel Syndrome."  Also, an ultrasound found evidence of "compromise of bilateral median nerves at the wrists" as well as "compromise of left ulnar nerve at the elbow."

---

[1] The Social Security Regulations define "light work" as work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).  The term "frequent" in this definition means "occurring from one-third to two-thirds of the time" – *i.e.*, "approximately 6 hours of an 8-hour workday." Canty v. Colvin, No. 6:14-cv-06713, 2015 WL 9077651, at *3 (W.D.N.Y. Dec. 16, 2015) (quoting Soc. Sec. Ruling 83-10, 1983 WL 31251, at *6 (1983) ("SSR 83-10")).

In contrast, the regulations define "sedentary work" as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a).  In this context, the term "occasionally" means "occurring from very little up to one-third of the time" – *i.e.*, "no more than about 2 hours of an 8-hour workday." Canty, 2015 WL 9077651, at *3 (quoting SSR 83-10, 1983 WL 31251, at *5).

In detailing the profession of "Firer, Locomotive," which the vocational expert and ALJ called a "train operator," the Dictionary of Occupational Titles employs the same definitions of "frequently" and "occasionally." See DICOT 910.363-010, 1991 WL 687739.  It adds that "constantly" means an "activity or condition exists 2/3 or more of the time." Id.

Because these definitions appear to be consistent, courts addressing other professions have contrasted "constant" activity with "frequent" or "occasional" activity in social security cases.  See, e.g., Danielle S. v. Comm'r of Soc. Sec., No. 1:19-cv-01359, 2021 WL 231511, at *4 (W.D.N.Y. Jan. 25, 2021).

Moreover, plaintiff's argument has some intuitive appeal. As noted, "frequently" in the context of light work means up to two-thirds of an eight-hour day. SSR 83-10, 1983 WL 31251, at *6. If (1) plaintiff has to hold down a dead man's switch for up to approximately six hours of an eight-hour day, (2) it causes him such pain that he must let go of the switch to relieve it, and (3) letting go effects the complete stop between stations, then the job is not one plaintiff should be doing. But the issue before me is not what I might do on a *de novo* review. It is whether there is substantial evidence to support the ALJ's determination. There is.

First, to say that plaintiff has severe nerve neuropathy in his wrists, as his EMG showed, does not mean that he has severe carpal tunnel syndrome – it only means that he has carpal tunnel syndrome of some degree of severity. The ALJ had to look elsewhere to determine whether that degree of severity precluded plaintiff from frequently holding down the dead man's switch.

That leads us to the only medical opinion in the record to address, albeit implicitly, whether plaintiff is able to perform that task. The consulting physician, Dr. Chaim Shtock, to whom the Commissioner frequently refers claimants for consultative examinations, opined that plaintiff had 4/5 strength in both hands, intact hand and finger dexterity, no muscle atrophy, and only "mild limitation using both hands for fine and gross manual activity due to weakness in both hands." A "mild limitation" appears consistent with the ALJ's determination that plaintiff can operate the dead man's switch "frequently" but not "constantly." See Danielle S., 2021 WL 231511, at *4 (collecting cases to show that "[a] moderate limitation is not inconsistent with a finding that an individual can engage in frequent, but not constant activity"); see also Lisa P. v. Comm'r of Soc. Sec., No. 19-cv-1155, 2021 WL 826715, at *3 (W.D.N.Y. March 4, 2021)

3

(accepting an ALJ's implicit reasoning that "a moderate sitting limitation would translate to a restriction to frequent sitting").

When the ALJ and plaintiff's attorney discussed Dr. Shtock's opinion at the outset of the hearing, there was an unusual exchange. Plaintiff's attorney stated that based on his experience in other cases, when Dr. Shtock writes "mild" he really means that a plaintiff can do the activity only "occasionally," not "frequently":

> ATTY: . . . I can show it with other documents but [Dr. Shtock] constantly writes mild and will write occasional[] use of the hands even with those mild limitations. He writes mild to moderate for heavy lifting and he'll note in his reports when he writes a residual functional capacity that means 10 pounds or less.
>
> ALJ: Okay, that's not here.
>
> ATTY: What's that?
>
> ALJ: That's not here.
>
> ATTY: It's not here. I'm telling you from past experiences so therefore if Your Honor does want to get an opinion from [Dr. Shtock] what he means when he writes the words mild to moderate.
>
> ALJ: I don't need you to tell me what he means.
>
> ATTY: Again, I don't know what he means and there's no way we can know but I do know from previous reports that I've seen from him over and over he can write mild to moderate and write that you're limited to sedentary as well.
>
> ALJ: All right, I don't see that here. I see mild limitations in both hands.
>
> ATTY: That's correct and what the word mild means I don't know and nobody can know but I can tell you from past experiences when he writes mild it typically m[e]ans occasional or less.
>
> ALJ: Okay.
>
> ATTY: And, again, there's nothing to support anything else in the record that would show otherwise. So, that's why I offered if Your Honor does feel that he should go to a consultative examination to determine the exact residual functional capacity by somebody who actually examines him by all means, he's more than happy to go.
>
> ALJ: Okay, thank you.

As this exchange shows, the attorney's purpose in making this point was that if the ALJ did not know Dr. Shtock's alleged meaning based on the ALJ's own experience, the ALJ should get another consultation "to determine exact residual functional capacity."

Plaintiff now suggests that the ALJ erred in not taking up this suggestion at the hearing – that is, not contacting Dr. Shtock for clarification or ordering another examination to show that plaintiff could operate the dead man's switch "frequently." In advancing this argument, plaintiff relies on the rule that it is the ALJ's obligation, even when a claimant has representation, to develop the record. See generally Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999). However, plaintiff seems to recognize that, generally, a "mild" impairment is consistent with an ability to perform an activity "frequently," not just "occasionally." He urges, nevertheless, that the ALJ should have done more to develop the record to show that when it comes to Dr. Shtock, there is, or should be, a special rule.

The duty to develop the record does not go that far. As the ALJ recognized, and as plaintiff seems to agree, a "mild" limitation usually means the activity can be performed at least "frequently." See Danielle S., 2021 WL 231511, at *4. Because plaintiff had the burden of proving that he could not do his past relevant work, see, e.g., Iqbal v. Comm'r of Soc. Sec., No. 1:16-cv-0722, 2017 WL 3475492, at *5 (N.D.N.Y. Aug. 11, 2017), it was his obligation to produce evidence showing the special circumstances upon which he relied. Indeed, plaintiff's attorney told the ALJ at the hearing that he could show "with other documents" that Dr. Shtock "will write occasional[] use of the hands even with those mild limitations." But plaintiff's attorney never submitted any of those "other documents." Nor, despite knowing that it was Dr. Shtock who was doing the consultation, did he send his client back to a physician to get a

functional assessment that might have classified plaintiff's carpal tunnel syndrome as "moderate" or "severe," thereby contradicting Dr. Shtock.

Even in the inquisitorial, non-adversarial context of a disability hearing, a claimant's lawyer is not a potted plant. The ALJ had a record that was complete, and the ALJ had no obligation to confirm, investigate, or refute plaintiff's attorney's representation, which was based solely on his alleged personal experience.

Other evidence further supported the ALJ's decision to rely on Dr. Shtock's opinion as stated. Plaintiff's claim is not subject to the treating physician rule, which was rescinded prior to plaintiff's filing of his claim. Even if that rule applied, however, plaintiff effectively had no treating physician. He had one appointment with an orthopedist, Dr. David Edelstein, who specializes in hand and arm treatment, before he filed his disability claim. Although Dr. Edelstein's note confirms that plaintiff has carpal tunnel syndrome, Dr. Edelstein made no functional assessment, and nothing in his intake note allows an inference of such an assessment. To the extent Dr. Edelstein said anything about the severity of plaintiff's carpal tunnel syndrome, it tended towards the same conclusion of a "mild" limitation, consistent with Dr. Shtock's opinion. As Dr. Edelstein stated in his note:

> **Impression/Plan:**
>
> . . .
>
> I counseled the patient regarding the following:
>
> Nonsurgical treatment is indicated for mild cases whereas surgery is indicated for more severe cases that have not responded to conservative management. If carpal tunnel syndrome is treated in its early stages with proper physical therapy and modification of factors causing the problem, it might be possible to alleviate or reduce the symptoms and stop the progression of the disease. Modifying activity by creating rest periods, adjusting computer workstation positions, and providing better wrist support may help.

6

> Contact office if pain worsens in your hand, if you have difficulty sleeping, or if there is an increasing disability.
>
> **Note:**
>
> B[ilateral carpal tunnel syndrome].  Will treat in brace.  Had nerve test in past.  If not better in a month, would consider an injection or surgery.

Plaintiff never returned to Dr. Edelstein.  He sought no further treatment for his hands at all from any healthcare provider.  In fact, plaintiff testified at the hearing that he was not even taking any medication for his hands.  When the ALJ asked him why, the following exchange ensued:

> Q: So why don't you take any pain medication?
>
> A: I don't, I just, I don't feel confident that it's helping, you know, I feel that medicines also have side effects and so I try to stay away from it.  I deal with it the best I can and it just seems that I would be putting more chemicals into my body than is necessary but, I understand what doctor[s] say but a lot of times what they say may work for some person, for some people and may not work for others.
>
> Q: And why haven't you had treatment since October 2016?
>
> A: I mean, the only thing they prescribed was surgery and I really didn't feel I wanted to do that.  I was told that some surgeries work and then sometimes it don't so.
>
> Q: So but you never went to a doctor because the pain or the tingling was too much or go to the emergency room for pain, numbness?
>
> A: Ever since, you know, I got to the point every time and I realized what it was and I just tried to do the best I could to physically endure the pain.

We know from Dr. Edelstein's intake note that plaintiff's assessment was not accurate.  It was not a question of surgery or nothing.  The intake note expressly references the possibility of injections, and there may be other medical solutions that could help plaintiff.  See, e.g., Rivera v. Comm'r of Soc. Sec., 368 F. Supp. 3d 626, 638 (S.D.N.Y. 2019) (noting the use of medication to treat carpal tunnel syndrome); Mayo Clinic, Carpal Tunnel Syndrome, https://www.mayoclinic. org/diseases-conditions/carpal-tunnel-syndrome/diagnosis-treatment/drc-20355608 (last visited

7

Apr. 1, 2021) (describing several non-surgical alternatives).  As far as plaintiff's desire not to put "more chemicals into [his] body" by taking pain medication, it is certainly his prerogative to abstain from medication – and from one perspective, his desire might be viewed as commendable.  But I do not think the regulations permit him to follow that approach and then use it as a basis for obtaining disability benefits when, in fact, it might well be that moderate, non-surgical, or minimal surgical treatment could have alleviated or reduced plaintiff's pain without any material consequences.

In sum, Dr. Shtock's unchallenged assessment of a mild limitation, Dr. Edelstein's notes that suggest the same conclusion, and plaintiff's decision to reject any treatment of his condition constitute substantial evidence sufficient to support the ALJ's decision.

Plaintiff's motion for judgment on the pleadings [10] is therefore denied, and the Commissioner's cross-motion for judgment on the pleadings [11] is granted.  The Clerk is directed to enter judgment, dismissing the case.

**SO ORDERED.**                            Digitally signed by Brian M. Cogan
                                           _____
                                                          U.S.D.J.

Dated: Brooklyn, New York
       April 1, 2021